**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 13-cv-02147-RM

DINO CASTELLANO,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

This matter is before the Court on Plaintiff Dino Castellano ("Plaintiff") request for judicial review pursuant to 42 U.S.C. § 405(g).  (ECF No.1.)  Plaintiff challenges the final decision of Defendant, Commissioner of the Social Security Administration ("Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act").  42 U.S.C. §§ 1381-83c.  For the reasons set forth below, the Court AFFIRMS the denial of Plaintiff's SSI application.

## I.      BACKGROUND

### A.      Relevant Medical Evidence

Plaintiff was born on November 22, 1958, and was 53 years old on the date his application was filed.  (Tr. 25.)  Plaintiff was 55 years old at the time of the ALJ's decision, and alleged disability due to memory problems, back pain, and headaches.  (*Id.* at 20, 22.)  He also alleged that he had symptoms associated with a remote brain injury and that he is illiterate.  (*Id.* at 84.)

On April 24, 2012, Plaintiff received a physical and mental functional capacity evaluation from Elizabeth Lowell-Tupa, PhD.  (*Id.* at 290.)  Dr. Lowell-Tupa's report stated that a "[s]taff member helped [Plaintiff] fill out a written psychological questionnaire as [Plaintiff] states he can neither read or write."  (*Id.* at 287.)  Dr. Lowell-Tupa observed that Plaintiff was unable to spell the word "world" or count by sevens, but that he was able to count by fours, recall three out of three items immediately, recall two out of three items after five minutes and eventually remember the third item with assistance.  (*Id.* at 289.)  Dr. Lowell-Tupa stated that, although Plaintiff's speech was clear, "it was slow and he evidenced mild poor verbal skills.  His thought processes appear to be organized but somewhat slow."  (*Id.* at 288.)  Dr. Lowell-Tupa diagnosed Plaintiff with alcohol dependence and moderate major depressive disorder and assigned him a global assessment of functioning (GAF) score of 50.  (*Id.* at 289.)

Dr. Lowell-Tupa concluded that Plaintiff's ability to understand, remember and carry out simple instructions was moderately impaired, as was his ability to make simple work-related judgments.  (*Id.*)  She determined that his ability to carry out complex instructions and make complex work-related decisions was markedly impaired.  (*Id.* at 290.)  Dr. Lowell-Tupa determined that his ability to maintain concentration and maintain pace in both daily life and work activities was moderately impaired, and that he had a moderate impairment in his adaptability to changes.  (*Id.*)  She found Plaintiff's ability to relate to the public, coworkers and supervisors to be mildly impaired, but that his ability to respond to criticism and accept instructions was not impaired, and that he could work near others without excessive distractions.  (*Id.*)  Dr. Lowell-Tupa opined that his attendance at work would likely be a marked issue primarily because of his then existing alcohol abuse and also because of depressive symptoms which were also exacerbated by alcohol abuse.  (*Id.*)  Dr. Lowell-Tupa concluded that Plaintiff,

among other things, was "illiterate and is likely of low average to borderline intellectual functioning." (*Id.* at 290.)

Also on April 24, 2012, Thurman Hodge, D.O., conducted Plaintiff's physical functional capacity evaluation in connection with his application for benefits. (*Id.* at 295.) Dr. Hodge diagnosed Plaintiff with uncontrolled hypertension, poor dentition, acute thoracic and lumbosacral strain/spasm, and left shoulder pain with abduction of greater than 90 degrees. (*Id.*) Dr. Hodge found evidence, based on X-rays of Plaintiff's neck and lower back, of mild diffuse degenerative disc disease and mild degenerative facet joint arthropathy. (*Id.* at 297-98.) Dr. Hodge found that Plaintiff was "being truthful and the exam was performed with full cooperation, even with limitations." (*Id.* at 292.) Dr. Hodge also examined Plaintiff's shoulders and found:

> Exam of the right shoulder was without abnormality. Left shoulder had pain with abduction greater than 90 degrees. There was no swelling or erythema. Range of motion is as follows: Abduction; right 180 degrees, left 90 degrees. Rotation on abduction is 90 degrees; right 80 degrees, left 60 degrees. Internal rotation; right 80 degrees, left 80 degrees. External rotation; right 90 degrees, left 90 degrees.

(*Id.*at 294.) No significant limitations were found to exist based on these specific findings as to the shoulders. Dr. Hodge found overall an ability to sit (6 hours), stand (4 hours), walk (4 hours), bend, squat, lift (30 pounds), carry (20 pounds) and do daily activities and repetitive motions "with his left arm at less than 90 degrees abduction." (*Id.*)

During Plaintiff's examination before both Dr. Hodge and Dr. Tupa, Plaintiff discussed a traumatic head injury he suffered when he "fell 3 stories out of a building in 1983." (*Id.* at 291.) Plaintiff stated he was hospitalized for two months and that he had undergone brain surgery. (*Id.* at 287-88.) No specific limitation or impairment was found by either to flow from this accident.

On May 19, 2012, Plaintiff was admitted to the Denver Health Medical Center and diagnosed with an upper gastrointestinal (GI) bleed, alcohol abuse, H. pylori infection, and

history of hepatitis C (*Id.* at 311.)  The GI bleed was surgically repaired and treatment was prescribed for his infection.  (*Id.*)  After his hospitalization, Plaintiff claims to have quit drinking alcohol.  (*Id.* at 45.)

In June, 2012, Anthony LoGalbo, M.D., a state agency physician, reviewed Plaintiff's record and opined that Plaintiff had limitations consistent with the ability to perform a reduced range of medium work.  (*Id.* at 91-92.)  State agency psychologist Barbara Martinez, Ph.D., reviewed the evidence and concluded that Plaintiff had mental limitations consistent with the ability to perform unskilled work.  (*Id.* at 89, 94.)

On November 7, 2012, Plaintiff was seen at the Denver Health Outpatient clinic for the purpose of establishing a primary care provider.  (*Id.* at 306.)  At the time of the visit, Plaintiff complained of neck pain "shooting up to the top of his head and down his back," shoulder pain, and the feeling that his "hands and feet don't work sometimes."  (*Id.* at 306.)  Plaintiff also told Sarah Christensen, M.D., upon examination, that he was "trying to quit drinking since May." (*Id.*)  Dr. Christensen noted that Plaintiff's neurological exam was normal and prescribed ibuprofen and Tylenol for pain.  (*Id.* at 306.)  Dr. Christensen also ordered X-rays of the neck, which showed some narrowing of the spinal canal, greater on the right than left.  (*Id.* at 304.)  On November 14, 2014, Dr. Christensen notified Plaintiff of the X-ray results, prescribed physical therapy, and confirmed with Plaintiff that his neurological exam was normal.  (*Id.* at 304.)

On November 19, 2012, Plaintiff was seen at the Denver Health Outpatient Clinic in order to follow up on X-ray results and to review his medications.  (*Id.* at 300.)  The results of an examination by Michelle Cleeves, M.D. performed during that visit showed that Plaintiff presented with some stiffness in the muscles of his neck, but that his neurological exam was normal.  (*Id.*)  Dr. Cleeves recommended that Plaintiff undergo a disability evaluation.  (*Id.*)

In addition to the above, several pieces of evidence are present in the record concerning Plaintiff's ability to read and write. In many instances, the evidence is contradictory. For example, one Adult Function Report Plaintiff completed in connection with his application for benefits stated that he cannot read. (*Id.* at 207.) In a separate Function Report, Plaintiff reports being able to use a checkbook and money orders. (*Id.* at 238.) On the Disability Report that Plaintiff completed in connection with his application, he answered no to questions of whether he could "read and understand English" and whether he could "write more than your name in English." (*Id.* at 225; *see also id.* at 240.) However, a separate Disability Report lists Plaintiff's answer as yes to these same questions. (*Id.* at 191.) Responding to a question regarding his ability to follow written instructions, Plaintiff stated that he "can't read." (*Id.* at 240.)

### B. Plaintiff's Testimony at The ALJ Hearing, The ALJ's Decision and Plaintiff's Appeal

At the hearing held on January 18, 2013, Plaintiff testified that his mailing address was in Denver, but that he had been homeless for about four years. (*Id.*) Plaintiff further testified that he had dropped out of high school after reaching the eleventh grade and that he does not have a GED. (*Id.* at 36; *see also id.* at 227.) Plaintiff went on to list the jobs he had performed prior to the onset of his alleged disability, including work for True Green Lawn Care, Urban Farmer, and other employments generally as a day laborer. (*Id.* 37-39.) Plaintiff testified that he was taking a number of medications for his various maladies and pain, although he could not remember the names of those medications other than aspirin. (*Id.* 39-40.) Plaintiff testified that he quit drinking alcohol altogether in May of 2012. (*Id.* at 40.) Plaintiff testified that, prior to May 2012, he would drink every day and would panhandle to get the money to buy liquor. (*Id.* at 41.)

Plaintiff testified that he could not read or write, except for "a little bit." (*Id.* at 42.) He

stated that his niece filled out the forms required to apply for disability benefits and that he had told her what to write.  (*Id.* at 43.)  In response to the ALJ's question as to whether Plaintiff could write a simple word like "dog or cat," Plaintiff replied that he could write those words, his name, and other easy names like "John" but that he did not know "the months," and that he "really [doesn't] get into writing."  (*Id.*)  Plaintiff stated that he was able to count money up to about $25.00.  (*Id.* at 44.)  He testified that he could add and subtract, and could read "easy word[s]."  (*Id.*)  He further stated that he understood most of the street signs in Denver because he had grown up there.  (*Id.*)  Plaintiff further stated that he had someone help him fill out the applications for the jobs that he had held in the past and that he could not fill out a job application on his own.  (*Id.* at 47-48.)

Plaintiff went on to testify about the difficulties he experienced with his memory.  Upon questioning from the ALJ, Plaintiff testified that he was able to remember having a bologna sandwich that had been given to him at a homeless mission four days previously.  (*Id.* at 46.) Plaintiff testified that he could remember things that were relatively recent but he had "to really think about" things that had happened "back further."  (*Id.* at 46-47.)

Applying the five step sequential analysis set forth under 20 C.F.R. § 416.920(a), the ALJ issued an opinion on January 28, 2013 finding that Plaintiff was not disabled and denying his application.  (*Id.* at 17-26.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 25, 2012, Plaintiff's application date.  (*Id.* at 20.)  At step two, the ALJ found that Plaintiff had several "severe" impairments, including status-post traumatic brain injury with memory deficits and headaches, major depressive disorder, alcohol abuse, and mild cervical and lumbar disc disease.  (*Id.* at 20-21.)  The ALJ then proceeded to step three, finding that Plaintiff did not have an impairment or combination of impairments that

met or medically equaled the requirements of any per se disabling impairment.  (*Id.* at 20-21.)

The ALJ then computed Plaintiff's Residual Functioning Capacity ("RFC") as being able to

perform a range of light work activities with certain limitations.  (*Id.* at 21-22.)  Specifically, the

ALJ found that Plaintiff is able to lift thirty pounds occasionally and twenty pounds frequently,

carry twenty pounds occasionally and ten pounds frequently; that Plaintiff can sit for six hours,

stand for four hours and walk for four hours over the course of an eight hour work day; that

Plaintiff could occasionally stoop and kneel but should avoid crawling and climbing ladders and

scaffolds; that Plaintiff should also avoid exposure to unprotected heights and open machinery.

(*Id.*)  The ALJ further found that Plaintiff is able to maintain concentration, persistence and pace

to understand remember, and carry out routine and repetitive, but not complex or detailed

instructions.  (*Id.*)  Citing 20 C.F.R. § 416.964, the ALJ determined that Plaintiff has a marginal

education and is able to communicate in English.  (*Id.* at 25.)  At step four, the ALJ found that

the transferability of job skills would not be an issue as Plaintiff's past relevant work is

unskilled.  (*Id.* at 25.)  At step five, the ALJ relied in part on vocational expert ("VE") testimony

to determine that Plaintiff could perform other jobs existing in significant numbers in the

national economy.  (*Id.* at 25-26.)  The ALJ therefore determined that Plaintiff was not disabled

under the Act.  (*Id.*)

Plaintiff timely filed a Request for Review with the Appeals Council which was denied.

(*Id.* at 1-3.)  Plaintiff appealed that decision by bringing this lawsuit.  (ECF No. 1.)

## II.   LEGAL STANDARDS

### A.   Standard of Review

The Court reviews the Commissioner's decision to determine whether substantial

evidence in the record as a whole supports the factual findings and whether the correct legal

standards were applied. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations omitted). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* (citation omitted). "It requires more than a scintilla, but less than preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted).

Although a district court will "not reweigh the evidence or retry the case," it "meticulously examine[s] the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citation omitted); *see also* 42 U.S.C. § 405(g). Evidence is not substantial if it is overwhelmed by other evidence in the record. *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (citation omitted). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the agency. *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citation omitted). As the Tenth Circuit Court of Appeals observed in *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 480 (10th Cir. 1993), the ALJ also has a basic duty of inquiry to "fully and fairly develop the record as to material issues." *Id.* at 479-480 (citations omitted). This duty exists even when the claimant is represented by counsel. *Id.* at 480 (citations omitted).

Also, "[t]he failure to apply the correct legal standard or to provide [a reviewing] court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citation and internal quotation marks omitted); *see also Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (holding that "the Secretary's failure to apply the correct legal standards, or to show us that [he] has done so, are . . . grounds for reversal") (citation omitted).

### B.    Evaluation of Disability

The criteria for SSI payments under Title XVI of the Act are determined on the basis of the individual's income, resources, and other relevant characteristics.  42 U.S.C. § 1382(c)(1).  In addition to being financially eligible, the individual must file an application for SSI and be under a disability as defined in the Act.  42 U.S.C. § 1382.  The criteria to obtain DIB under Title II of the Act are that a claimant meets the insured status requirements, is younger than 65 years of age, files an application for a period of disability, and is under a "disability" as defined under Title II of the Act.  42 U.S.C. §§ 416(i), 423(a); *Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002); *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  In addition, the individual's disability must have begun before his or her disability-insured status has expired.  20 C.F.R. § 404.101(a); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *8 (1983).

The Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [that] can be expected to result in death or [that] has lasted or can be expected to last for a continuous period of not [fewer] than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).

There is a five-step sequence for evaluating a disability.  *See* 20 C.F.R. § 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step analysis).  If it is determined that a claimant is or is not disabled at any point in the analysis, the analysis ends. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).  First, the claimant must demonstrate that he or she is not currently involved in any substantial, gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  Second, the claimant must show a medically severe impairment or combination of impairments that significantly limits his or her physical or mental

ability to do basic work activities. *Id*. at § 416.920(a)(4)(ii). Third, if the impairment matches or is equivalent to an established listing under the governing regulations, the claimant is judged conclusively disabled. *Id*. at § 416.920(a)(4)(iii). If the claimant's impairment does not match or is not equivalent to an established listing, the analysis proceeds to the fourth step where the claimant must show that the "impairment prevents [him or her] from performing work [he or she] has performed in the past." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988) (citations omitted); *accord* 20 C.F.R. § 416.920(a)(4)(iv). If the claimant is able to perform his or her previous work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). Fifth, the Commissioner must demonstrate: (1) that based on the claimant's RFC, age, education, and work experience, the claimant can perform other work; and (2) the work that the claimant can perform is available in significant numbers in the national economy. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987); *see also* 20 C.F.R. § 416.920(a)(4)(v).

## III. ANALYSIS

Plaintiff claims three errors were committed by the ALJ: (1) that the ALJ incorrectly determined that Plaintiff should be classified as having a marginal education as opposed to being illiterate; (2) that the ALJ failed to find that Plaintiff's shoulder impairment was a severe impairment; and (3) that the ALJ failed to properly consider Plaintiff's shoulder injury and Plaintiff's non-exertional limitations in computing his RFC.

### A. The ALJ's Determination Regarding Plaintiff's Level of Education

Plaintiff argues that the record evidence in this case shows that the ALJ should have determined Plaintiff to be illiterate as that term is defined in the Act at 20 C.F.R. § 416.964(b)(1). Because Plaintiff is an individual closely approaching advanced age, has only unskilled prior work, and was determined by the ALJ to have an RFC to perform only light

work, so argues Plaintiff, the fact that he is also illiterate means that he would be presumptively

disabled according to the "grid" rules set forth in Appendix 2 to Subpart P of Part 404, §202.09.

The Court finds that the ALJ's determination that Plaintiff has a "marginal education" is

supported by substantial evidence.

Under the Act, an applicant's education level is determined by analysis of several factors

that would impact the amount of knowledge and skills that the person would possess, including

"formal schooling or other training which contributes to [that person's] ability to meet vocational

requirements," "past work experience and the kinds of responsibilities [the person] had when [he

was] working," and that person's "daily activities, hobbies, or the results of testing . . . ." 20

C.F.R. § 416.964(a) and (b).  While the numerical grade level that the applicant completes in

school may be used in some cases to determine the applicant's education, this value may not be

reflective of the applicant's educational abilities—and thus should not be used—where that

education was "completed many years before [the applicant's] impairment began" or where there

is "other evidence to contradict it . . . ."  *Id.*; *Dollar v. Bowen*, 821 F.2d 530, 535 (10th Cir.

1987).

An applicant's educational level may be roughly approximated as one of several

categories based on an evaluation of an applicant's education and past experiences.  An applicant

may be termed "illiterate" where that person has an "inability to read or write" and, more

specifically, "cannot read or write a simple message such as instructions or inventory lists even

though the person can sign his or her name."  20 C.F.R. § 416.964(b)(1); *see also Dixon v.

Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) ("This definition makes explicit that literacy turns

upon the ability to write as well as to read.")  "Generally, an illiterate person has had little or no

formal schooling."  20 C.F.R. § 416.964(b)(1).  An applicant would be classified as having a

"marginal education" where that person has an "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." 20 C.F.R. § 416.964(b)(2). "We generally consider that formal schooling at a 6th grade level or less is a marginal education." *Id.* An applicant may also be classified as having a "limited education," a "high school education," or as having an "inability to communicate in English." 20 C.F.R. § 416.964(b)(3), (4) and (5).

In his January 18, 2013 decision, the ALJ determined that Plaintiff had what would qualify as having a "marginal" education under 20 C.F.R. § 416.964(b)(2). While the ALJ acknowledged the fact that Plaintiff had reached the tenth grade in school, which would otherwise cause him to be categorized as having a "limited" education under 20 C.F.R. § 416.964(b)(3), the ALJ found that a categorization of "marginal" education would be more appropriate based on Plaintiff's "state[ment] at the hearing that he can read and write a little, but only easy words, and he can add and subtract" but that Plaintiff "did not think he could complete an employment application." (Tr. 25.) The ALJ concluded that the evidence would not support a finding that Plaintiff is illiterate. (*Id.*)

The Court finds that the ALJ's determination was based on substantial evidence. First, as the ALJ acknowledged, Plaintiff had received some formal education and had reached the tenth grade[1] before dropping out of school. However, the numerical grade level that an applicant completes in school should not be used to determine the applicant's education level where there is "other evidence to contradict it." 20 C.F.R. § 416.964(b); *Dollar*, 821 F.2d at 535. Instead of labeling Plaintiff as having a "limited education," as would otherwise correspond to a formal education reaching the tenth grade, the ALJ concluded that Plaintiff had a "marginal" education based on Plaintiff's testimony at the January 18, 2013 hearing that "he can read and write a little,

---

[1] There is a disparity in the record as to whether Plaintiff attained the tenth or eleventh grade. However, because the ALJ assessed Plaintiff as having an education level that would correspond to a formal education far below either the tenth or eleventh grade, such disparity is irrelevant.

but only easy words, and he can add and subtract" but that "[h]e did not think he could complete an employment application." (Tr. 25.)

There are several entries in Plaintiff's applications and medical history that would corroborate the Plaintiff's testimony at the January 18, 2013 hearing—and the ALJ's conclusion based upon that testimony—that Plaintiff possessed at least a marginal education. Although Plaintiff answered no to questions of whether he could "read and understand English" and whether he could "write more than your name in English" on one of the Disability Reports he completed in connection with his application, (*Id.* at 225; *see also id.* at 240), on a separate Disability Report Plaintiff responded yes to these same questions. (*Id.* at 191.) A "Disability Determination Explanation" made prior to Plaintiff's case analysis before the ALJ also concludes that Plaintiff "can read/write in English" and that there is no history of Plaintiff receiving any special education. (*Id.* at 80.) That Disability Determination also points out that on Plaintiff's "initial application he states he can read and write in English, yet on his ADLs he says he cannot read." (*Id.* at 82.) In an interview conducted on June 30, 2011, the interviewer reported "No" to a question of whether Plaintiff "had difficulty" with "reading" or "writing," among other skills. (*Id.* at 189; *but see Id.* at 223 (based on an interview conducted on February 6, 2012, interviewer responded "yes" to whether Plaintiff would have trouble with "reading" but not "writing").) In another form, Plaintiff answered affirmatively to questions of whether he could perform the following tasks: pay bills; count change; handle a savings account; use a checkbook or money orders. (*Id.* at 238.) Plaintiff further stated that he "feels he can pay his own bills and manage his own money" during his examination by Dr. Lowell-Tupa. He acknowledged to Dr. Lowell-Tupa having previously had a driver's license by stating that has not had a driver's license "for many years." (*Id.* at 288.)

In his testimony before the ALJ, Plaintiff acknowledged that he could count money up to about twenty-five dollars. (*Id.* at 43-44.) He further indicated that he knew "all my street signs" and could read "just a little bit." (*Id.* at 42, 44.) He also indicated that he could "add and subtract" (*Id.* at 44) and read "easy word[s]." (*Id.*) Moreover, Plaintiff's work history reveals a past history of working in the type of "simple, unskilled types of jobs" referenced in 20 C.F.R. § 416.964(b)(2). (*Id.* at 193, 210-12.) And he reported to Dr. Lowell-Tupa his reason for ceasing such work was that he could "no longer do that work physically." (*Id.* at 290.)

In the view of the Court, this matter is similar to that discussed by the Court of Appeals in *Newburn v.Barnhart*, 62 Fed.App'x. 300 (10th Cir. 2003). There, in assessing the claimed illiteracy of an applicant for Social Security benefits, the Tenth Circuit concluded that:

> [i]n this case, Mr. Newman completed the sixth grade and testified that he could "read and write . . . a little bit," and when working as a bus driver, could generally read a road map. His mathematics ability was confined to "low numbers." Mr. Newman's background does not meet the definition of illiteracy; his testimony does not contradict a finding of marginal educational abilities. The evidence in the record is therefore sufficient to sustain the ALJ's finding that Mr. Newman had a marginal education.

*Barnhart*, 62 Fed.App'x. at 304 (internal citations omitted).

While there are certain contradictory instances in the record where Plaintiff does report that he cannot read or write, there is substantial evidence in the record, as cited and explained above, that corroborate the ALJ's determination that Plaintiff possessed a "marginal education" as that term is defined at 20 C.F.R. § 416.964 and that Plaintiff is not illiterate. The ALJ's determination was not made in error and was supported by substantial evidence.

**B.**     **The ALJ's Conclusion Regarding Plaintiff's Shoulder Injury**

Plaintiff argues that the ALJ erred in failing to find that his shoulder injury constituted a severe impairment. The ALJ concluded at step two of his sequential analysis that Plaintiff had the following severe impairments: status-post traumatic brain injury with memory deficits and

14

headaches, major depressive disorder, alcohol abuse and mild cervical and lumbar disc disease. (Tr. 20.)  Although the ALJ did not discuss Plaintiff's shoulder issues in his analysis at step two, the ALJ did mention in his RFC analysis that Plaintiff "exhibited no range of motion abnormalities other than some pain with left shoulder abduction" as noted from his examination by Dr. Hodges, and at other points in his analysis in making the RFC determination.  (*Id.* at 24.)

The Tenth Circuit has found that "[a]n error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ . . . finds another impairment is severe and proceeds to the remaining steps of the evaluation." *Grotendorst v. Astrue*, 370 Fed. App'x. 879, 883 (10th Cir. 2010) (citations omitted).  "This is because *all* medically determinable impairments, severe or not, must be taken into account at those later steps."  *Id.* (emphasis in original); *see Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."); *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) ("We can easily dispose of . . . arguments[] which relate to the severity of [claimant's] impairments.  The ALJ . . . made an explicit finding that [claimant] suffered from severe impairments.  That was all the ALJ was required to do in that regard.  [Claimant's] real complaint is with how the ALJ ruled at step five.").  Specifically, the Act mandates that the ALJ give consideration to all of a claimant's medically determinable impairments, severe or otherwise, throughout his sequential analysis:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.

20 C.F.R. § 404.1523; *see also* 20 C.F.R. § 404.1545(a)(2).  In other words, regardless of the ALJ's determination at step two as to which of a claimant's impairments are severe, an incorrect finding as to the severity of any one impairment would be reversible error *only if* the ALJ then failed to consider that impairment when making his subsequent calculation of the claimant's RFC and following determinations at step four and five.  *Grotendorst*, 370 Fed. App'x. at 884.

Here, the ALJ found that Plaintiff had several severe impairments, although Plaintiff's shoulder injury was not one of those impairments listed.  However, despite the ALJ's implicit determination that Plaintiff's shoulder issues were not of a severe nature, the ALJ nonetheless went on to consider that impairment when assessing Plaintiff's RFC.  (Tr. 24.)  Even if this Court were to assume that the ALJ erred in determining that Plaintiff's shoulder issues were not severe, such error is harmless where, as here, "the ALJ . . . finds another impairment is severe and proceeds to the remaining steps of the evaluation."  *Grotendorst*, 370 Fed. App'x. at 883.  With respect to Plaintiff's shoulder injury specifically, this error is clearly harmless because that injury was specifically considered in the ALJ's RFC analysis.  *Id.*

C.     **The ALJ's Assignment of Plaintiff's RFC**

In his final point of error, Plaintiff argues that the ALJ failed to properly determine Plaintiff's RFC.  Specifically, Plaintiff argues that the ALJ failed to address the physical limitations caused by Plaintiff's shoulder impairment and also argues, in a somewhat conclusory manner, that the ALJ failed to address the limitations caused by Plaintiff's non-exertional impairments.

In determining a claimant's RFC, the Commission is bound to consider all of the claimant's alleged impairments, both severe and non-severe, and any related symptoms, such as pain, that may cause physical and mental limitations that affect what an individual is capable of

16

doing in the workplace.  20 C.F.R. § 416.945(a).  The RFC is an assessment of the most an individual can do despite his limitations.  *Id.*  "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."  *Williams v. Colvin*, 524 Fed.App'x. 414, 417 (10th Cir. 2013) (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).  "When multiple impairments are involved, the assessment of RFC reflects the restrictions resulting from all impairments (both severe and not severe impairments)."  SSR 86-8 at 6.  As explained below, this Court concludes that the ALJ's RFC determination did incorporate adequate consideration of both Plaintiff's shoulder issues and his non-exertional impairments and was based on substantial evidence.

With respect to Plaintiff's shoulder injury, at the January 18, 2013 hearing the ALJ presented a hypothetical to the VE that discussed such a limitation on reaching.  (Tr. 65, 69.) The ALJ acknowledged that he relied upon the VE's testimony in response to these hypotheticals in determining that there are jobs that exist in significant numbers in the national economy that Plaintiff is able to perform.  (*Id.*at 25-26.)  In his opinion, the ALJ stated his heavy reliance upon the functional capacity examination performed by Dr. Hodge, which included an in-depth discussion of Plaintiff's shoulder injury and its probable etiology.  (*Id.* at 24, 295.)  In his RFC analysis, the ALJ identified Plaintiff's submission that "his right shoulder was fractured in the past and did not heal correctly, causing difficulty with reaching fully above his head."  (*Id.* at 22.)  The ALJ again referred to Plaintiff's shoulder issue in his RFC analysis, asserting that Plaintiff "exhibited no range of motion abnormalities other than some pain with left shoulder abduction" as observed in Plaintiff's examination by Dr. Hodges.  (*Id.* at 24.)  Based on the foregoing, it is clear that the ALJ gave due consideration to Plaintiff's shoulder injury when

conducting his RFC analysis—and also in subsequent steps of his sequential analysis—and that the ALJ's conclusions in that regard were supported by substantial evidence.

With respect to Plaintiff's claimed non-exertional impairments, the ALJ concluded that Plaintiff "is able to maintain concentration, persistence and pace to understand, remember and carry out routine and repetitive, but not complex or detailed instructions." (*Id.* at 21-22.)  The ALJ limited Plaintiff to being capable of performing no greater than unskilled work.  (*Id.*)  In support thereof, the ALJ pointed to the findings of Dr. Lowell-Tupa, which the ALJ afforded "substantial weight" in his analysis.  Specifically, Dr. Lowell-Tupa determined that Plaintiff's "ability to maintain concentration to complete daily life and work related activities is moderately impaired," as was his "adaptability and flexibility to changes in his routine."  (*Id.* at 290.)  Similarly, Dr. Lowell-Tupa found that Plaintiff's "ability to relate to the public, coworkers, and supervisors may be mildly impaired."  (*Id.*)  Although Dr. Lowell-Tupa described Plaintiff's ability to respond to complex instructions as "markedly impaired," his "ability to understand, remember and carry out simple instructions is moderately impaired as is his ability to make judgments regarding simple work-related decisions."  (*Id.*)  The conclusions of Dr. Lowell-Tupa track the ALJ's own evaluation that such "findings certainly support some deficits in the claimant's ability to perform work-related mental tasks but are not persuasive in showing that he would be incapable of understanding, remembering and carrying out routine and repetitive work tasks."  (*Id.* at 24.)  The ALJ thus concluded that Plaintiff "maintains the concentration, persistence and pace to understand, remember and carry out routine and repetitive, but not complex or detailed instructions."  (*Id.*at 25.)  Based on the foregoing, it is clear that the ALJ gave due consideration to Plaintiff's non-exertional impairments when conducting his RFC

analysis—and also in subsequent steps of his sequential analysis—and that the ALJ's conclusions were supported by substantial evidence.

Further, in making his RFC determination, the ALJ stated that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (*Id.* at 14.) *See Flaherty*, 515 F.3d at 1071 (a reviewing court should take "the lower tribunal at its word when it declares that it has considered a matter"); *Eggleston*, 851 F.2d at 1247 (where ALJ's report "addresses" the claimant's various impairments, this was sufficient to infer that the ALJ had properly considered their combined effects without other indications to the contrary). The ALJ then went further and gave individual attention to each of Plaintiff's alleged maladies in formulating Plaintiff's RFC and also articulated specific reasons for discounting Plaintiff's report of the severity of his symptoms. As such, the ALJ's calculation of Plaintiff's RFC was based on substantial evidence.

## IV.    CONCLUSION

Based on the foregoing, the Court AFFIRMS Defendant's denial of Supplemental Security Income benefits.

Dated this 25th day of November, 2015

BY THE COURT:

RAYMOND P. MOORE
United States District Judge